We'll hear argument first this morning in Case 16-1161, Gill v. Whitford. Mr. Saitlan. Mr. Chief Justice, and may it please the Court, this Court has never uncovered judicially manageable standards for determining when politicians have acted too politically in drawing district lines. Plaintiff social science metrics composed of statewide vote-to-seat ratios and hypothetical projections do not solve any of these problems. Instead, they would merely shift districting from elected public officials to Federal courts, who would decide the fate of maps based upon battles of the experts. Now, as a threshold matter, this Court should hold that Federal courts lack jurisdiction to entertain statewide political gerrymandering challenges, leaving for another day the question of district-specific gerrymandering challenges. Kennedy, I think it's true that there's no case that directly helps Respondents very strongly on the standing issue. You have a strong argument there. But suppose the Court, and you just have to assume we won't know exactly the parameters of it, decided that this is a First Amendment issue, not an equal protection issue. Would that change the calculus so that if you're in one part of the State, you have a First Amendment interest in having your party strong or the other party weak? No, it wouldn't, Your Honor. And I think the reason for that is, even if it's a First Amendment issue, it's still grounded in the right to vote. In our country's single-district election system, folks only vote in their own district. For example, you might have some vague interest in the party that you're associated with having more members in Congress, for example. Like a Wisconsin Republican might want more Texas Republicans in Congress. But no one would say that you have a First Amendment or a First 14th Amendment right in that sort of circumstance to challenge some Texas law that you would, for example, argue led to less Republicans from Texas coming to the Congress. Roberts. Roberts. Roberts. Well, but I think the argument is pretty straightforward, which you, in your district, have a right of association, and you want to exercise that right of association with other people elsewhere in the State. And if you can't challenge the districting throughout the State, then your claim seems to be there's no way for you to raise your claim. And this, of course, and this, of course, confines it to the State and eliminates the problem of outer State. That's the way the Chief Justice stated the hypothetical. Well, Your Honor, I don't think it would solve the interstate problem, because, of course, the structural relationship of, for example, Mr. Let's assume that it does. Well, Your Honor, I still think that this Court should be very careful about enacting that kind of doctrine. As we know, race and politics are often correlated in this country. So political gerrymandering claims and racially gerrymandering claims, even if they're ultimately grounded in a different constitutional amendment, will often be raised together. And it cannot be the case that if there's a showing that the map drawer turned on the racial screen, the person is limited to a single district claim. But if that same map drawer turned on the political screen, then the plaintiff would get access to the holy grail of a State-wide claim based on the law. Ginsburg I'm not on the question of race. And some years ago, this Court dealt with what the so-called Max Block Plan said is a deliberate attempt by the legislature to make as many African-American districts as possible. This bears a certain resemblance because the effort here intentionally was to create as many Republican districts. So is Max Republican? Doesn't it have the same problem that Max Block did? Well, Your Honor, that turns to the issue of justiciability. And I do not think that raises the same problems, because, of course, politics is not a suspect classification like race. And I think the easiest way to see this is to take a look at a chart that Plaintiff's own expert created, and that's available on Supplemental Appendix 235. This is Plaintiff's expert studied maps from 30 years, and he identified the 17 worst of the worst maps. What is so striking about that list of 17 is that 10 were neutral draws. There were court-drawn maps, commission-drawn maps, bipartisan-drawn maps, including the immediately prior Wisconsin-drawn map. And I think the Court should learn two lessons from this list of 17, 10 of which were neutral. The first lesson is that partisan symmetry is simply not a neutral districting criteria. It is not a neutral method of drawing districts. For if it were, all of these commissions would not be drawing partisan asymmetry maps. The second lesson that this Court should learn from that list is that Plaintiffs are asking this Court to launch a redistricting revolution based upon their social science metrics. Alito, which I assume you will want to do in a minute, could I just ask you a question about standing along the lines of those asked by my colleagues? Suppose that it was alleged that town officials in some place in northern Wisconsin where the Republicans predominate were discriminating against the Democratic candidate for a legislative district by, let's say, not allowing that candidate's signs to be put up along the roadsides, but allowing the Republican signs to be put up along the roadsides, or they were pressuring town — let's just leave it at that. They're discriminating with respect to these signs. Now, who would have standing to raise a First Amendment challenge to that? Would it be just the candidate in that district or maybe voters in that district? Or could a Democratic voter in, let's say, Milwaukee have standing to raise that First Amendment argument? I would certainly think, Your Honor, the candidate would have standing. And I'm not so sure about the voters in the district, but probably. But certainly voters in Milwaukee who don't vote for that candidate, they're not eligible to vote for that candidate any more than someone in California is eligible to vote for that candidate. And I think we see this from the — But I'm sorry, certainly voters in Milwaukee, you left out the — would not have standing? Would not have standing. And I think we see this from the testimony of the lead Plaintiff, who is the only Plaintiff that testified in this case. He was asked during his testimony, what harm does Act 43 put on you, given that you live in a Democratic-dominated district in Madison under any possible map? Well, he said, I want to be able to campaign for a majority in the assembly, which shows that his injury has nothing to do with him as a voter. It's just a generalized interest in more Wisconsinites, more Wisconsin Democrats being elected, which someone in Wisconsin can have or someone outside of Wisconsin. I think we're anxious to get to the merits, but one more thing on the sign. Suppose the sign in the southern part of the State had talked about an issue which was very important to the people in Milwaukee. I think one could frame a hypothetical where, if it was some sort of a home rule thing where Milwaukee's right to have certain height buildings was affected, you could have no longer a generalized interest. But we don't have anything like that here. All right. So can I do this, because I think the hard issue in this case is, are there standards manageable by a court, not by some group of social science, political, you know, computer experts? I understand that, and I'm quite sympathetic to that. So let me spend exactly 30 seconds, if I can, giving you, as you've read all these briefs, I have too. This is where I am at the moment, not that I'm for this. React to this as you wish, and if you wish to say nothing, say nothing. And it's for everybody, because it's a little complicated. When I read all that social science stuff and the computer stuff, I said, well, is there a way of reducing it to something that's manageable? So I'd have step one. The judge says, was there one-party control of the redistricting? If the answer to that is no, say there was a bipartisan commission, end of case. Okay? Step two, is there partisan asymmetry? In other words, does the map treat the political parties differently? And a good evidence of that is a party that got 48 percent of the vote got a majority of the legislature. Other evidence of that is what they call the E.G., which is not quite so complicated as the opposition makes it think. Okay? In other words, you look to see it. Question three is, is there going to be persistent asymmetry over a range of votes? That is to say, one-party A gets 48 percent, 49 percent, 50 percent, 51. That's sort of the S-curve shows you that, you know, whether there is or is not. And there has to be some. And if there is, you say, is this an extreme outlier in respect to asymmetry? And there we have Eric Lander's brief. Okay? You know that one. And we look through thousands and thousands of maps, and somebody did it with real maps and said, how bad is this compared to, you know, the worst in the country? And then, if all those the test flunks, all those things, you say, is there any justification? Was there any other motive? Was there any other justification? Now, I suspect that that's manageable. I'm not positive. And so I throw it out there as my effort to take the technicalities and turn them into possibly manageable questions for a response from anyone insofar as you wish to respond, and if you wish to say, I wish to say nothing, that's okay with me. Thank you, Your Honor. I'd like to talk about the third and fourth aspects of that, because I think those are – I've already talked about the second a little bit. But with regard to the third, which is persistence, that is exactly the kind of conjectural, hypothetical state of affairs inquiry that was submitted to this Court in LULAC in Professor King's amicus brief. Because, of course, as your suggestion – suggested steps recognize, a single election doesn't mean much. A single election, you could have an E.G. for any particular reason. So you would have federal courts engaging in battles of the hypothetical experts, deciding, well, what would it be under this map or that map? So I think that's not a starter for that reason. Now with regard to extremity, this was an – Well, if I could just stop you there for a second, because I was under the impression that legislators are capable of doing this actually pretty easily now. You know, the world of voting technology has changed a great deal. And when legislatures think about drawing these maps, they're not only thinking about the next election, they're thinking often – not always, but often – about the election after that, and the election after that, and the election after that. And they do sensitivity testing, and they use other methods in order to ensure that certain results will obtain not only in the next one, but eight years down the road. And it seems to me that just as legislatures do that, in order to entrench majorities or minorities, as the case may be, in order to entrench a party in power, so too those same techniques, which have become extremely sophisticated, can be used to evaluate what they're doing. Well, Your Honor, legislatures don't have to worry about judicial and municipal standards. Legislatures don't have to worry about false positives, false negatives. Legislatures don't have to worry about conjecture. What I'm suggesting is that this is not kind of hypothetical, airy-fairy, we guess and then we guess again. I mean, this is pretty scientific by this point. Well, Your Honor, there are just estimates, and they are not scientific. And let me give you one example from the record. I'm sorry. There are estimates where you haven't put any social scientists to say that the estimates are wrong. You've poked holes, but every single social science metric points in the same direction. So there are five of them. Your map drawer is one of them, by the way, the person who actually drew these maps. And what we know is that they started out with the court plan. They created three or four different maps. They weren't partisan enough. They created three or four more maps. They weren't partisan enough. And they finally got to the final map after maybe 10 different tries of making it more partisan, and they achieved a map that was the most partisan on the S-curve. And it worked. It worked better than they even expected. So the estimate wasn't wrong. The estimate was pretty right. So if it's the most extreme map they could make, why isn't that enough to prove partisan asymmetry and unconstitutional gerrymandering? Well, Your Honor, I think the facts in this case, which is what you were discussing, are significantly less troubling than the facts in the cases that this Court has previously faced, for example, Vandermeer and Veith. And that's for two reasons. One, the map drawers here complied fastidiously with traditional district principles, which was not true in Vandermeer and Veith. But they kept going back to fix the map to make it more gerrymandered. That's undisputed. People involved in the process had traditional maps that complied with traditional criteria and then went back and threw out those maps and created some that were more partisan. That's correct, Your Honor. And, of course, there were computers used. So why didn't they take one of the earlier maps? Because there was no constitutional requirement that they do so. They complied with all state law. That's the point. And they complied with all traditional district principles. Can I take you back to Justice Kagan's question about the legislator's use of these techniques? Are all the techniques that are used by politicians in order to try to maximize their chances of electoral success scientific? I think they rely a lot on polls, don't they? Or how scientific have they proven to be? Of course, Your Honor. Legislatures can very much rest on conjunction, whereas courts cannot. If I could reserve the balance of my time. Thank you, counsel. Ms. Murphy. Mr. Chief Justice, and may it please the Court. Plaintiffs have not identified a workable standard for determining when the inherently political task of districting becomes too political for the Constitution to tolerate. Indeed, the only thing plaintiffs have added to the mix since Luloch is a wasted votes test that identifies court-drawn maps as enduring partisan gerrymanders and conveniently favors their own political party. You've probably considered the hypo many times. Suppose the state constitution or state statute says all districts shall be designed as closely as possible to conform with traditional principles, but the overriding concern is to increase, have a maximum number of votes for party X or party Y. What result? I think if you have something that says the ultimate principle that we're going to follow is abandon all other criteria in favor of partisan advantage, at least you're closer at that point. I don't think that was the question. It was it satisfies all the traditional criteria, contiguous, but it was a deliberate attempt to maximize the number of seats that Republicans would hold. And this is mandated by the state constitution. I don't think that in a world where the legislature is required to and is in fact complying with a number of other metrics and is, as one of those things, taking into account partisan advantage, that you've proven a constitutional violation. It's not a manageable standard. It's not a manageable standard that you cannot have a law that says draw maps to favor one party or the other. That seems like a perfectly manageable standard. You cannot have that. If it's on the face of a statute, I think you have a different scenario, because at least at that point, you know the intent. You know, there's no debate to have about the intent of what the legislature is doing, and if they are intentionally drawing for one purpose or for other purposes. Well, there are plenty of areas of law, Ms. Murphy, where we look at intent beyond the face of a statute. And, you know, sometimes that's harder than other times. We understand it can be difficult. We understand in other cases it can be easy. But we do it all over the place in our law. We don't say, oh, if it's not on the face of the statute, we're never going to look at it. So if your answer to Justice Alito is, well, on the face of the statute, that's certainly a manageable standard. I guess I would ask, why not if it's not on the face of the statute? But you have good evidence that there was the intent here, and you have good evidence that the intent led to a certain kind of effect, which was to entrench a party in power. I think what differentiates this from a lot of other contexts is that here we have opinion after opinion from this Court, dissenting opinions, concurring opinions, plurality opinions, what have you, saying that considering politics and districting is not in and of itself inherently unconstitutional. So just finding the intent isn't a problem. I'd like to go back to Justice Breyer's question, and it would be helpful to get an answer from me on that. What criteria would a state need to know in order to avoid having every district and every case and every election subject to litigation? because the standards given in the lower court here was, well, a little bit of partisan symmetry problem, a little bit of efficiency gap problem, not a real set of criteria. And here, you know, is it 7 percent? How durable? How many elections would we need? How much data would we have to gather? Walk us through Justice Breyer's question and provide some answers, if you would. Sure. So I think some of the problems with the criteria that have been suggested, in particular with a test that focused on these symmetry metrics, is that so far the metrics that we have, I mean, they identify false positives roughly 50 percent of the time. And I don't know how a legislature is supposed to comply with criteria that can't differentiate between a court-drawn map and a map drawn for partisan advantage. So when you start with this partisan symmetry concept, you automatically have the basic problem that you have to have some way to decide what is the appropriate partisan asymmetry. Okay. But what are the questions, you know, I need 2 years or 2 cycles worth of data, I need an S-curve of a certain shape and size, I need an efficiency gap of 7, what are the numbers, what are the criteria we'd have to fill in as a constitutional matter in order for a State to be able to administer this? Well, I mean, with all due respect, I'm not convinced that there are manageable criteria for the courts to be putting on legislatures for how to go about this process. And I certainly don't think that anyone in this case has identified that. But I would suggest that, you know, one of the starting points, you know, is that one of the starting points for me would have to be that traditional districting criteria should matter in the analysis. If you have a legislature that has started by saying we're going to comply with everything that we're supposed to do, not only as a legal matter, but also all of these practical constraints, we're going to draw districts that comply. Ginsburg. Because your time is running out, I would like to ask you what's really behind all of this. The precious right to vote, if you can stack a legislature in this way, what incentive is there for a voter to exercise this vote? Whether it's a Democratic district or a Republican district, the result, using this map, the result is preordained in most of the districts. Isn't that, I mean, what becomes of the precious right to vote? Will we have that result when the individual citizen says, I have no choice, I'm in this district, and we know how this district is going to come out? I mean, that's something that the society should be concerned about. Saharsky. Well, a couple of responses to that, Your Honor. First of all, it's inherent in our districting scheme that there are plenty of people who are always going to be voting in districts where they know what the result is going to be. And that has nothing to do with partisan gerrymandering. It has to do with the geography of politics and the fact that some of us just live in districts where we know that our vote will come out one way or another. Ginsburg. In Wisconsin, before this plan, was it the case that when it was something like 49 out of 99 districts were uncontested, nobody, the election wasn't contested because one party or the other was going to win? Saharsky. Well, I don't think you can quite draw that conclusion from the fact there's uncontested races. I mean, the reality is that political parties have to make decisions about where to put their resources, and they're going to have to do that for reasons that, again, have nothing to do with districting for partisan advantage. They have to do with the fact that drawing districts is always going to reflect political calculations and it's always going to be driven by communities of interest. And communities of interest sometimes feel very strongly about one political party rather than another. Kennedy. I have to say that I don't think you ever answered the question if the State has a law or a constitutional amendment that's saying all legitimate factors must be used in a way to favor party X or party Y, is that lawful? I think it's on the face of the Constitution as a requirement the district, the legislature must comply with, then that could be your instance of a problem that can be actually solved by the Constitution. But it's quite different to me when you have a facially neutral districting factor. Is that an equal protection violation or a First Amendment violation? Well, it's a little hard to say at this point because, you know, it really just hasn't been fully explored, this concept of how you would come at all of this from a First Amendment perspective. I think this comes back to really the standing question. Well, you said there's a Constitution. Is it equal protection? I think the question, I mean, it would be who has standing to bring their case. We assume standing. I'd like an answer to the question. Yes. It would be an unconstitutional if it was on the face of it, and I think that that would be better thought of probably as an equal protection violation, but you could think of it just as well, I think, as a First Amendment violation in the sense that it is viewpoint discrimination against the individuals who the legislation is saying you have to specifically draw the maps in a way to injure. But, again, I just don't think it's fair to say it's an equal protection violation. Sotomayor, could you tell me what the value is to democracy from political gerrymandering? How does that help our system of government?  Well, I would point to the question. You almost concede that it doesn't when you say if a State has a constitutional amendment or has a law that says you must comply with traditional criteria, but you must also politically gerrymander. You're saying that might be unconstitutional. It might be, but I don't think that necessarily means that districting for partisan advantage has no positive values. I would point you to, for instance, Justice Breyer's dissenting opinion in Veith, which has an extensive discussion of how it can actually do good things for our system to have districts drawn in a way that makes it easier for voters to understand who they are, who the legislature is. It produces values in terms of accountability that are valuable so that the people understand who is in power. Sotomayor, I really don't understand how any of that, what that means. I mean, it's okay to stack the decks so that for 10 years or an indefinite period of time, one party, even though it gets a minority of votes, can't get a minority of votes, can get the majority of seats? With all due respect, you know, I would certainly dispute the premise that the decks are stacked here. At the end of the day, what matters is how people vote in elections, and that's what's going to determine the outcomes, as it has in Wisconsin, where the Republicans have won majorities because they've actually won the majority of the vote in most of the elections over the past 4 years. Thank you, counsel. Mr. Smith? Mr. Chief Justice, and may it please the Court, what the state is asking for here is a free pass to continue using an assembly map that is so extreme that it effectively nullifies democracy. As this case illustrates, it's now possible, even in a 50-50 state like Wisconsin, to draw a district map that is so reliably and extremely biased that it effectively decides in advance who's going to control the legislative body for the entire decade. Maybe we can just talk briefly about the standing issue. It is a little arresting to have a rule that we establish that when your claim is racial gerrymandering, it has to be limited to your district. You can't complain about racial gerrymandering elsewhere in the state. But here, if the claim is going to be political gerrymandering, you can raise claims about whole statewide issues, even if there is no argument that you're gerrymandered, like the first plaintiff whose vote's in Madison. His vote isn't diluted in any way, and yet he is able to complain about voting anywhere in the state. Well, Mr. Chief Justice, I think that standing has to follow from the nature of the injury, and that follows from the nature of the constitutional violation. A racial gerrymandering claim, a Shaw v. Reno claim, is an attack on a particular district for being drawn with excessive focus on race. In that situation, the injury has to be localized to the place where that district is. Partisan gerrymandering has the same word in it, but it's an entirely different kind of injury because it involves dilution of votes. Racial gerrymandering is analytically distinct from any dilution case. I don't understand.  Well, what about the sign hypothetical? You know, you're up in far north of Wisconsin, and somebody is taking down the signs for the one candidate in the far south. That affects that individual's, the strength of his vote for the statewide purposes. Does he really have standing to complain about that? Well, Your Honor, I think you could decide that while it might have some de minimis effect on the interest of any Democrat attempting to carry out that group's political agenda, that it's sufficiently de minimis that you wouldn't want to give standing to people outside the directly affected area. Why is it de minimis? It seems to me it's exactly the same thing. If you have a system, let's extend it to many towns that are controlled by the Republicans, and they're taking down all the Democratic signs. And if that's an effective strategy, it will mean fewer members of the legislature are Democrats, and therefore the interests of the Democratic voter in Milwaukee or in Madison will be impaired. It seems like exactly the same thing. Well, Your Honor, if you had a systematic effort in a lot of places by members of one party to prevent the other party from campaigning effectively, I think that anybody in the Democratic Party in the State would have standing. All right. Well, let's look at the race issue. So you have a State where there you have an African-American voter in one part of the State who wants to complain that districts in another part of the State are packed or cracked, and as a result of that, there are going to be fewer African-Americans in the legislature than there should be, and that's going to impair that person's interests, including, I would suppose, their right of association. What is the difference between those two situations? Well, Your Honor, that's a Section 2 vote dilution claim, and I think that the law appropriately limits standing in that situation to people who live in the region of the State where there's an absence of an additional minority district. And you wouldn't want to assume that some African-American from a different part of the State has a collective interest with people over here in this part of the State just because of race. That's just stereotyping. But with party, people join the party to work together to achieve a collective end. So that's not the case. Well, but that's equally stereotyping. Sometimes people vote for a wide variety of reasons. Maybe the candidate, although he's of a different party, is a friend, is a neighbor. Maybe they think it's a good idea to have the representatives from their district to balance out what they view would be likely candidates from other districts. Maybe they do. I don't think it's any more stereo – any less stereotypical to say that people are going to vote for parties because they support everything the party does statewide. Well, but to have standing, I think you'd want to find plaintiffs who do that, Your Honor. And certainly the plaintiffs we have here are thoroughgoing supporters of the disfavored party. Their party has been punished by the law of the State of Wisconsin. And I think that the standing issue ought to be satisfied by the description of what our claim is, which comes right out of Justice Kennedy's concurrence in Vieth, where – this is on page 86A of the jurisdictional statement, the White Appendix. It's just a two-sentence description of our claim. First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views. In the context of partisan gerrymandering, that means that First Amendment concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights. So the group is the targeted people. Those are the people who have the injury, the injury to their First Amendment interests. And anybody in the group has – should be able to bring a First Amendment argument to the table. Kagan. Mr. Smith, I'm – do you have a standing – well, Justice Kagan. Kagan. Kagan. In a one-person, one-vote case, does one person in an overpopulated district have standing to challenge not only that district, those district lines, but the entire State map? That is true. That is the way that's been handled ever since the Reynolds case. And why is that? And does it – is it an analogy to this case? Well, it's certainly a helpful analogy. It's not exactly the same because they have to live in an overpopulated district rather than an underpopulated district. But those are the people in – who suffer vote dilution because they're living in the overpopulated districts. And the Court has said not only does that person have standing to challenge their own district, but also to challenge the entire map and make all of the districts closer in population. That's just the way that's been handled since the 60s. Mr. Smith, I'm going to follow an example of one of my colleagues and lay out for you as concisely as I can what is – what is the main problem for me and give you an opportunity to address it. I would think if these – if the claim is allowed to proceed, there will naturally be a lot of these claims raised around the country. Politics is a very important driving force, and those claims will be raised. And every one of them will come here for a decision on the merits. These cases are not within our discretionary jurisdiction. They're the mandatory jurisdiction. We will have to decide in every case whether the Democrats win or the Republicans win. So it's going to be a problem here across the board. And if you're the intelligent man on the street and the Court issues a decision and let's say, okay, the Democrats win, and that person will say, well, why did the Democrats win? And the answer is going to be because E.G. was greater than 7 percent, where E.G. is the sigma of party X wasted votes minus the sigma of party Y wasted votes over the sigma of party X votes plus party Y votes. And the intelligent man on the street is going to say that's a bunch of baloney. It must be because the Supreme Court preferred the Democrats over the Republicans. And that's going to come out one case after another, as these cases are brought in every State. And that is going to cause very serious harm to the status and integrity of the decisions of this Court in the eyes of the country. It is just not, it seems, a palatable answer to say the ruling was based on the fact that E.G. was greater than 7 percent. That doesn't sound like language in the Constitution. Waxman. Your Honor, the first thing I would say in response to that is that those challenges are already being brought. Partisan gerrymandered maps get challenged. They get challenged in other ways, under the one-person, one-vote doctrine, under the racial gerrymandering doctrine, under Section 2. And so you're getting those cases. Most of the statewide districting maps in this country are challenged every 10 years in some way or another. What would make the system work better is if people could bring a challenge to what they actually think is wrong with the map, which is that it's anti-democratic. It decides in advance that one party is going to control the State government for 10 years, and maybe for 20 years, because they can replicate it at the end of the 10 years and do it again. That is the real problem. And I think what the Court needs to know is this is a cusp of a really serious, more serious problem as gerrymandering becomes more sophisticated with computers and data analytics and an electorate that is very polarized and more predictable than it's ever been before. If you let this go, if you say this is we're not going to have a judicial remedy for this problem, in 2020 you're going to have a festival of copycat gerrymandering, the likes of which this country has never seen. And it may be that you can protect the Court from seeming political, but the country is going to lose faith in democracy big time, because voters are going to be like the voters in Wisconsin and know it really doesn't matter whether I vote. Roberts. But you're going to take these issues, the whole point is you're taking these issues away from democracy and you're throwing them into the courts. Pursuant to, and it may be simply my educational background, but I can only describe a sociological gobbledygook. Your Honor, this is not complicated. It is a measure of how unfair the map is, how much it burdens one party. Can you say this? Look, don't agree with me just because it sounds favorable, because he won't in two minutes. Can you answer the Chief Justice's question and say the reason they lost is because if Party A wins a majority of votes, Party A controls the legislature. That seems fair. And if Party A loses a majority of votes, it still controls the legislature. That doesn't seem fair. And can we say that without going into what I agree is pretty good gobbledygook? And if you need a convenient label for that approach, you can call it proportional representation, which has never been accepted as a political principle in the history of this country. Your Honor, we are not arguing for proportional representation. We are arguing for partisan symmetry, a map which, within rough bounds at least, treats the two parties relatively equal in terms of their ability to translate votes into seats. That sounds exactly like proportional representation to me. Proportional representation is when you give the same percentage of seats as they have a percentage of votes. That's what proportional representation means. And our claim simply doesn't remotely do that. It says if Party A at 54 percent gets 58 percent of the seats, Party B, when it gets 54 percent, ought to get 58 percent of the seats. That's symmetry. That's what the political scientists say is the right way to think about a map that does not distort the outcome and put a thumb on the scale. Now, we're Mr. Smith, can I just say something, ask you a question about the political science? I mean, gerrymandering is distasteful. But if we are going to impose a standard on the courts, it has to be something that's manageable and has to be something that's sufficiently concrete so that the public reaction to decisions is not going to be the one that the Chief Justice mentioned, that this three-judge court decided this way because two of the three were appointed by a Republican president or two of the three were appointed by a Democratic president. Now, it's been 30 years since Bandmer, and before then and since then, judges, scholars, legal scholars, political scientists have been looking for a manageable standard. All right. In 2014, a young researcher publishes a paper, Eric McGee, publishes a paper in which he says that the measures that were previously, the leading measures previously, symmetry and responsiveness are inadequate. But I have discovered the key. I have discovered the Rosetta Stone, and it's the efficiency gap. And then a year later, you bring this suit and you say, there it is. That is the constitutional standard. It's been finally, after 200 years, it's been finally discovered in this paper by a young researcher, who concludes in the end, this is the end of his paper, after saying that symmetry and responsiveness have shown to be, look to be inappropriate, the measure I have offered here, relative wasted votes, is arguably, arguably, a more valid and flexible measure of partisan gerrymandering. Now, is this the time for us to jump into this? Has there been a great body of scholarship that has tested this efficiency gap? It's full of questions. Mr. McGee's own amicus brief outlines numerous unanswered questions with this theory. What do you do in elections that are not contested? Well, then you have to make two guesses. How many people would have voted for the winning candidate if it had been a contested election? How many people would have voted for the losing candidate if it had been a contested election? One of the judges in the court below asks, why do you calculate E.G. by subtracting from the votes obtained by the winner, 50 percent of the votes, instead of the votes obtained by the runner-up? And Mr. McGee says, well, I have an answer to this, and I have a forthcoming paper, and I'll answer it in the forthcoming paper. And there are all of these questions. This is 2017. Is the time to jump into this? That's a question worth answering. Is there a question there, Your Honor? Yeah, there is a question there. There are about 10 of them. I would say this, if I might, Justice Alito. In VIF, the court appropriately laid down a challenge and said, if you want us to do this, you've got to give us a lot more than you've given us. You've got to give us two things, a substantive definition of fairness and a way to measure it so we can limit judicial intervention to the really serious cases. And so we won't have the court entering into the political fray all the time, but we'll have standards that say, you go this far, we're going to go after you. But in the meantime, anything less serious than that, we're going to leave to the political branches. And so the social scientists stepped up and said, we have three different ways to calculate asymmetry, not just one, the median mean measure, the partisan bias measure where you equalize them at 50-50, and the efficiency gap. And in this case, they all come to the exact same conclusion that this is one of the most extreme gerrymanders ever drawn in living memory of the United States, one of the five worst out of the 230 maps that Professor Jackman studied. And so there is no question here about this being the maximizing one-party control as far as they could go, as Justice Sotomayor was saying, they push the limits and push the limits and push the limits. And that they push the limits. And Mr. Smith, may I ask? I'm sorry, please. Smith, please go ahead. Kagan. I think that the symmetry idea is both an intuitive and an attractive principle. So if the first question was, do you have a substantive principle, I actually think you do. The second question is, are there ways to make sure that not every district is subject to challenge as violating that principle. And so I'd like to hear you talk about that. How is it that we are not going to create a world in which in every district somebody can come in and say, aha, there's been a violation of partisan symmetry. We're entitled to a redrawn map. What's the threshold? Where do you draw the line? Because this, this, it seems to me that this map goes over pretty much every line. That's true. But where do you draw the line in another case and another case? Well, Justice Kagan, the great virtue of these three different measures, none of which were presented to the Court in Vieth when I argued the Vieth case, and I didn't do a very good job, is that they each allow you to assign a number to each gerrymander. And that allows you to compare them across the country and back in history. And therefore, it is possible to draw a line. Now, in addition to just measuring the degree of asymmetry, the other thing that's true is that you measure the likelihood of durability of that asymmetry, and you do that with the sensitivity testing. So you make sure you don't have the kind of map that, with a small swing of voting over the next decade, is going to flip over, as the map in Pennsylvania in Vieth actually did. If we had the right tests, the ones that I'm now presenting to you, we wouldn't have won that case in 2004. But this map is never going to flip over. The evidence is unequivocal that the Democrats would have to have an earthquake of unprecedented proportions to even have a chance to get up to 50 votes out of 99. Roberts, all of those predictions, I mean, Vandermeer predicted the Democrats would never be able to attain a majority. It was 50-50 the next election, and they got a majority the one after that. You already mentioned Vieth. It was 5 days, right, after the district court said, oh, forget who it was, Republicans are never going to get elected, and they won every single race. Predicting on the basis of the statistics that are before us has been a very hazardous enterprise. The technique of sensitivity testing, which was done by the defendant's expert in the process of drawing the map to make sure that they were drawing a permanent, non-flippable gerrymander, and then done again by the experts for the plaintiffs, in this case in court, and tested by the court, is a method by which you identify one thing about the map. Does it have a lot of swing districts in it? A lot of competitive districts in it? Because if it does, you can have a map that looks very biased in one year when all those districts go one way, but it might flip over. That was Vandermeer, that was Vieth. That is not this case. They spent their entire time in those four months in that locked room doing two things, trying to maximize the amount of bias and eliminating systematically competitive districts, reducing it down to something less than 10 when it had been up around 20. And then even of those 10, they tinkered with it and tinkered with it to make sure that even that 10, they thought they could get at least 7, they ended up getting 8, and then eventually all 10. So are you suggesting that we should be looking for outliers, or are you suggesting that we should be trying to filter out all manner of partisan consideration, or is it someplace in between? Your Honor, the word outlier is probably an appropriate one. Certainly, we don't think, and we followed the lead of this Court and Justice Kennedy's concurrence and other decisions of this Court, that all partisanship is unconstitutional. What you need is a method by which the extreme gerrymander, the one that is fundamentally anti-democratic and is going to last for the full decade, can be identified and held unconstitutional, and that's the only thing we're asking you to do here. So, Mr. Smith, what is the formula that achieves that? Because the Court below didn't rely on efficiency gap entirely. It looked also at the partisan symmetry test. It reminds me a little bit of my steak rub. I like some turmeric, I like a few other little ingredients, and I'm not going to tell you how much of each. And so, what's this Court supposed to do? A pinch of this, a pinch of that? Or are we supposed to actually specify it's going to be the Chief Justice's formula of the efficiency gap of 7% for the country? Is that what you're asking us to do? What is it that you want us to constitutionalize? Well, Your Honor, the first thing I want to make clear is that symmetry is what's being measured by the efficiency gap, by the other two tests that I mentioned. Symmetry is the underlying substance. Well, but there are different tests for measuring symmetry, right? Right, there are. There is the test you previously proposed. Now there is the efficiency gap test. The Court relied on both and said a little bit of a pinch of this and a pinch of that. We're not telling you how much of each. So that doesn't seem very fair to the states, to me, to know what they're supposed to do to avoid the kind of litigation we're talking about. As I understand the efficiency gap test itself, and tell me if I'm wrong, that it would yield about a third of all the districts in the country winding up in court. Now, that's what the other side says, so tell me where that's wrong, and tell me what test you'd have this Court adopt. Well, first of all, I would go with the screens that Justice Breyer mentioned. The first one being it has to be a one-party state. That one third figure they keep throwing around ignores the fact that a number of those maps were drawn either by commissions or by courts or by divided legislatures. And so those all get taken off the table from the very beginning. If you have a one-party state, you then have to measure whether it's unusually asymmetrical, pretty extreme, and we- How? I'm still stuck on Justice Breyer's question. You can use any of those three tests that were all applied here. Any of them? Yes. Any of the three? And if they don't, I would suggest you apply all of them, and if they disagree, that would tell you maybe this isn't the right case to be holding something unconstitutional. That might be a fly in the ointment. But this is- Isn't it true that- Court below did not set the line. No, I- I'm sorry. Just on that, isn't it true that you can get very high levels of, a very high E.G. based on factors that have nothing to do with gerrymandering? The political geography can lead to it. Protection of incumbents, which has been said to be a legitimate factor, can lead to a high E.G. Compliance with the Voting Rights Act can affect that. Certainly, there are various factors that, other than partisan bias, that can lead you to draw a map that does not have a zero E.G. In our test, with the intent requirement, the effects requirement, and the justification requirement, all of those problems are taken care of, either at the intent stage or at the justification stage. How are they taken care of at the justification stage? The proposal is to run many, you know, millions of alternative maps to see whether, using some traditional districting requirements, you can produce a map that has a lower E.G. But my understanding is that when that's done, those maps do not take into account either compliance with the Voting Rights Act, both of which can have a very big effect. It's just one of the dozens of uncertainties about this whole process. Actually, they do take into account the Voting Rights Act. The Chen study that was discussed in one of the amicus briefs and is discussed somewhat in the merits briefs here, where he produced 200 randomly generated maps of Wisconsin using all the state's traditional criteria, he started with the minority districts that were already drawn by the state in Act 43 and kept those in place. And so then he generated, randomly generated maps, and he found that the degree of bias created by the political geography of Wisconsin is minute, modest, a little bit, something just like what the district court found, maybe 1 or 2 percent, not even remotely like what they have in the map. And so with that- Would it be fair to require plaintiffs to provide those maps, many, many of them, so that one can tell whether the actual map is an outlier? Well, I think in the cases going forward after these technologies are there, they will be in the record in almost every case. It has become the state of the art. Whether it ought to be something that the plaintiffs have to produce as part of their initial case, I'd have to think about it. It certainly could be done that way. There are, as the Lander brief and a couple of other briefs and the political geographer's brief all show, people who have developed the capacity for generating random maps that teach you a lot of lessons about the effects of neutral criteria of where people live, and allow you to say that has nothing to do with the degree of bias that we have here. And I think it will become a part of how these cases are decided. At the justification stage, it may also become evidence of intent or of how severe the effects are. It can be useful in a whole variety of ways. And now, again, social science has stepped up to the challenge. So, for example, that comes a way to filter out the effects of geography from the effects of partisan advantage? Yes, Your Honor. I would say that at the remedy stage, if they come back with a remedy map that matches the sort of neutral geography, even if it's somewhat favorable to the party that's in charge, that should be okay. They don't have to go to zero just at the remedy stage, but they have to come up with something much less extreme than their intentional gerrymandering. One that basically makes democracy no longer function, because basically, gerrymanders now are not your father's gerrymander. These are going to be really serious incursions on democracy if this Court doesn't do something. And this is really the last opportunity before we see this huge festival of new extreme gerrymanders, all done along the model of Wisconsin, but probably even more serious. I would commend the political scientist brief, which talked about the revolution in data analytics that has happened since this map was drawn. You're going to see people coming in and slicing and dicing a very polarized electorate to the point where one-party control will be guaranteed. That's going to become the norm. Indeed, in any one-party State, if you don't do it that way, they're going to say, well, that's malpractice. Why aren't you doing it in Wisconsin? Ginsburg. Ginsburg. You clarify what you mean by one-party State. Here, we know that the maps were drawn by the Republicans and everybody else was excluded. Even some Republicans were excluded. But suppose the legislature has a Republican majority, but there are Democrats, say it's 60, 40, 40 percent Democrat, and the redistricting is done by the legislature. Does that count? Do you count that as one party? I do, Your Honor. I think if there's a majority — one party has a majority in both houses of the legislature and the governorship, the fact that there are some representatives of the other party in a minority status would not negate the possibility that the thing was— Mr. Smith, is that a Republican form of government claim? I think it's a First Amendment claim and an equal protection claim. I'm not going to try to revive the Republican form of government clause at this late stage. Isn't that exactly what you're trying to do, though? No. You're saying it's a one-party rule and that would violate a Republican form of government guarantee. Wouldn't that be the more specific constitutional provision to look to rather than the generic equal protection clause? Well, I— For that matter, maybe we could just for a second talk about the arcane matter of the Constitution. And where exactly do we get authority to revise State legislative lines? When the Constitution authorizes the Federal Government to step in on State legislative matters, it's pretty clear. You look at the 15th Amendment, you look at the 19th Amendment, the 26th Amendment, and even the 14th Amendment in Section 2 says Congress has the power when State legislators don't provide the right to vote equally to dilute congressional representation. Aren't those all textual indications in the Constitution itself that maybe we ought to be cautious about stepping in here? Well, I don't think there's anything unusual about using the First Amendment and the 14th Amendment to regulate the abusive management of State elections by State government. That's what the Court has been doing. Where did one person, one vote come from? That's what Reynolds v. Sims and Baker v. Carr did, and a number of other cases that have followed along since. And the fact that Congress could conceivably regulate this problem under the 14th Amendment does not mean that the Court should not. There's a number of cases, the term limits case, Cook v. Graylike, where Congress could have used the Elections Clause to fix a problem, but the Court said, well, in the absence of congressional action, we're going to regulate an abusive misuse of the power to run Federal elections. And in this case, it's State elections. You'd have to rely, Congress would have to rely on Section 5 of the 14th Amendment, maybe they could in theory. But this is a problem which- Do you see any impediment to Congress acting in this area? Other than the fact that politicians are never going to fix gerrymandering. They like gerrymandering. The problem in this area is if you don't do it, it's locked up. The voters of Wisconsin can't get it on the ballot without the legislature's consent. And that's true in most of the states that don't have commissions now. And so you have, we're here telling you, you are the only institution in the United States that can do, that can solve this problem just as democracy is about to get worse because of the way gerrymandering is getting so much worse. You paint a very dire picture about gerrymandering and its effects. But I was struck by something in this seminal article by your expert, Mr. McGee. And he says there, I show that the effects of party control on bias are small, and decay rapidly, suggesting that redistricting is at best a blunt tool for promoting partisan interests. So he was wrong in that. He's right with the E.G. That's the Rosetta Stone, but he's wrong in that. Your Honor, I'd have to see what that sentence is saying in context. I'm quite confident Mr. McGee does not think that redistricting is a non-problem  Thank you, Your Honor. Thank you, Mr. Smith. Mr. Saitlan, you have five minutes remaining. I'd like to begin by answering Justice Kennedy's question. A facially discriminatory law in a State would violate the First Amendment because it would stigmatize that party. This case, this Court's cases could not be clearer that when you have neutral law, neutrally, facially neutral lines, the question is not a partisan intent, because there will always be partisan intent. The question is, have the plaintiffs presented a burden on representational rights based upon a limited, precise, judicially admissible standard? There has been nothing new presented to this Court. Basically, what the plaintiffs have done here is they've taken Professor King's amicus brief from LULAC. They have taken the exact same central concept, partisan asymmetry, and they've recycled it here. There is nothing new before this Court. Second, we've heard something about the various tests that they're now proposing. There was only one test that was subjected to adversarial scrutiny in this case at a four-day trial. That efficiency gap test proved so fatally flawed that the district court rejected it as the test, and plaintiffs abandoned it as the primary test on appeal. And then my final point about the scare tactics, about what will happen next. Plaintiffs' expert did a comprehensive study from 1972 at the one the Baker redistricting had happened to 2014. And you can look at that study. The chart on that study is on supplemental appendix 227. It shows that the asymmetry was worse, was worse in 1972 than in 2014. You're always going to have scare tactics. You're always going to have partisan intent. We have not had any advancement in terms of what has been presented to this Court since LULAC, where this Court properly criticized partisan asymmetry as not a neutral standard that has uniform acceptance. And we ask for those reasons for this Court to reverse the district court. Thank you, Your Honors. Roberts. Thank you, counsel. The case is submitted.